UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISADORE J. RUTLEDGE,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant*.

_____/

CASE NO. 17-cv-13651

DISTRICT JUDGE STEPHEN J. MURPHY, III
MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 11, 15)**

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 11), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 15), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Isadore J. Rutledge's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred

1

to the undersigned Magistrate Judge. (R. 2). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 11, 15).

Prior to the application at the heart of this case, Plaintiff had filed one earlier application for DIB benefits, on November 22, 2011, alleging his disability began on September 12, 2009. (R. 7 at Page ID # 102). The claim was denied initially and again after an administrative hearing. (*Id.* at Page ID # 99-118). The Appeals Council denied Plaintiff's request for review. (*Id.* at Page ID # 119-125). Plaintiff filed suit in this court on November 21, 2014, and his case was dismissed on April 4, 2016. *Rutledge v. Comm'r of Soc. Sec.*, Case No. 14-14468, 2016 WL 1294843 (E.D. Mich. Apr. 4, 2016). He did not appeal.

More recently, Plaintiff filed the application for DIB at issue here on December 26, 2014, (R. 7 at Page ID # 126), alleging onset on August 1, 2013, (*id.* at Page ID # 200). His claim was denied at the initial level on April 24, 2015. (Page ID # 126). After an administrative hearing was held at Plaintiff's request, (Page ID # 66-97), Administrative Law Judge (ALJ) Martha M. Gasparovich issued a decision finding that Plaintiff had not been under a disability from his alleged onset date through his date last insured, December 31, 2014. (Page ID # 46-65). The Appeals Council denied Plaintiff's request for review. (Page ID # 30-35). This action followed. (R. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or

has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

[he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found that Plaintiff had not been under a disability from the alleged onset date of August 1, 2013, through the date last insured of December 31, 2014. (R. 7 at Page ID # 60). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period. (*Id.* at Page ID # 51). Next, she determined Plaintiff had the following severe impairments: degenerative disc disease; degenerative facet arthropathy, L5-S1; lumbar radiculopathy; and asthma. (*Id.*). Additionally, he had non-severe impairments of glaucoma, a left elbow avulsion fracture, and hypertension. (*Id.* at Page ID # 51-52). His left knee pain, depression,

and peripheral vertigo[1] were non-medically determinable impairments. (*Id.* at Page ID # 53). He did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*). Before proceeding further, the ALJ found that Plaintiff had the RFC to perform a limited range of light work,

> as he retained the ability to stand and walk no more than six hours in an eight-hour workday; could sit up to six hours, but would require a sit/stand option at least every thirty minutes[2]; could lift no more than 20 pounds occasionally and 10 pounds frequently; could only crouch, crawl, kneel, climb, balance, bend, or stoop occasionally; and would need a clean air environment free from concentrated levels of dust, fumes, chemical[s], gases, and other airborne irritants.

(R. 7 at Page ID # 53-54). At steps four and five, she concluded Plaintiff was unable to perform any of his past relevant work, but that jobs he could perform existed in significant numbers in the national economy—specifically, a bench assembler (130,000 jobs nationally); an inspector (84,000 jobs nationally); or a packer (75,000 jobs nationally). (*Id.* at Page ID # 59-60). Thus, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, during the relevant time period. (*Id.* at Page ID # 60).

---

[1] The ALJ also refers to Plaintiff's peripheral vertigo as a "non-severe impairment" on one occasion but goes on to explain it is not a medically determinable impairment at all because the record does not show a diagnosis of vertigo by an acceptable medical source based on objective evidence. (R. 7 at Page ID # 52).

[2] Of course, if Plaintiff switched positions every 30 minutes during an eight-hour workday, he would sit for four hours and stand for four hours, effectively lowering his maximum for each from six hours. But I suggest that any error is harmless because the hypotheticals posed to the Vocational Expert made clear that she was to identify jobs with the option to sit or stand every 30 minutes, (R. 7 at Page ID # 65), and thus implicitly limited Plaintiff to four hours sitting and four hours standing in an eight-hour workday. *See Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 679 (6th Cir. 2013) (finding same internal contradiction in RFC harmless where ALJ's description of RFC to VE included all the relevant limitations).

### E.  Administrative Record

#### 1.  Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.  Application Reports and Administrative Hearing

##### i.  Plaintiff's Function Report

Plaintiff completed a function report on February 9, 2015. (R. 7 at Page ID #259-266). His asthma, back conditions, arthritis, glaucoma, hypertension, and depression kept him from working. (*Id.* at Page ID # 259, 266) His asthma caused shortness of breath and sensitivity to dust, chemicals, and sudden changes in temperature, while his back conditions restricted his range of motion and caused enough pain that he was forced to rest and rely on medication. (*Id.* at Page ID # 259). Arthritis pained him in the mornings and sometimes throughout the day, as well as in cold and damp conditions. (*Id.*). His glaucoma affected his vision and made his eyes red and watery, his hypertension caused headaches, dizziness, and "sick feelings," and he was burdened with "sad moods" and problems coping due to his depression. (*Id.* at Page ID # 259).

On an average day, he would wake up, pray, wash up, make phone calls, eat, take any medicine he needed, watch television, check the mail, and sometimes lie down again, or attend any appointments he had. (*Id.* at Page ID # 260). Previously, he had been able to work, paint, and use tools like an axe, shovel, or sledge hammer. (*Id.*). Now, it took longer for him to dress, bathe, care for his hair, shave, and sometimes to get up after using the

toilet. (*Id.*). Pain sometimes troubled his sleep and compelled him to switch positions frequently. (*Id.*).

Though he did not need reminders to take care of his personal needs or grooming, his wife did remind him to take his medication. (*Id.* at Page ID # 261). He remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.* at Page ID # 262).

He did not do any house or yard work, hoping to avoid back spasms and pain, and due to a hurt right ankle and balance that was "off sometimes." (*Id.* at Page ID # 261-262). He prepared microwave meals and sandwiches, but did not cook full meals. (*Id.* at Page ID # 261). He went out for appointments and with his wife; sometimes driving and other times riding along. (*Id.* at Page ID # 262).

As far as his hobbies and interests, he enjoyed going to church most Sundays, unless he was in too much pain, and watching movies on television every day. (*Id.* at Page ID # 263). He had no problems getting along with others and sometimes had guests over, although not "that much." (*Id.* at Page ID # 263-264). His conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs, though he did not explain how. (*Id.* at Page ID # 264). He did not know for how long he could walk or pay attention. (*Id.*). He followed written and spoken instructions well. (*Id.*). Stress he handled "not so well." (*Id.* at Page ID # 265). He did not know how he handled changes in routine. (*Id.*).

Plaintiff used a cane and glasses, and thrice weekly used a DeRoyal T 600 Hot & Cold Therapy Unit that had been prescribed four or five years previously. (*Id.*). He did not

report any side effects from his medications. (*Id.* at Page ID # 266). In early 2015, he had started counseling "for coping and emotional issues." (*Id.* at Page ID # 266).

Plaintiff also completed an asthma form, dated February 16, 2015. (*Id.* at Page ID # 274-275). He had not had an asthma attack requiring inpatient hospitalization in the past year, though he had gone to the emergency room twice in the past year for asthma attacks. (*Id.* at Page ID # 274). He was unsure of the dates. (*Id.*). Too much activity in hot or cold weather, chemicals, running, or working around dust could trigger an attack, which lasted until he took two or three puffs of his rescue inhaler. (*Id.*). He also took Qvar daily. (*Id.*). In between attacks, he sometimes experienced wheezing or trouble breathing around chemicals, or after a sudden change in temperature or "too much activities." (*Id.* at Page ID # 275).

### ii. Third Party Function Report

Plaintiff's wife, Yvette Marlene Rutledge, submitted a function report in January 2015 that largely corroborates Plaintiff's account. (R. 7 at Page ID # 234-241). The two lived together in an apartment. (*Id.*). Plaintiff's wife reported that he was unable to sit, stand, or walk "for long periods of time" without triggering back spasms and weakness in his leg. (*Id.* at Page ID # 234). On an average day, he watched television, laid in bed, checked the mail, took his medication as needed, and ate. (*Id.* at Page ID # 235). Previously, he had been able to exercise, lift weights, and walk long distances. (*Id.*). Now, his sleep was troubled by pain and he had to switch positions frequently. (*Id.*). He also dressed and bathed slower than he used to, though his wife stated his conditions did not affect his ability

9

to care for his hair, shave, feed himself, or use the toilet. (*Id.*). She affirmed that she needed to remind him to take his medicine. (*Id.* at Page ID # 236).

As Plaintiff had, his wife stated that he did not usually cook, but prepared sandwiches and frozen meals while she was at work. (*Id.*). He did no household chores because prolonged standing or bending "irritate[d] his condition." (*Id.* at Page ID # 237). He went outside three to four times a week and could drive "when necessary." (*Id.*). Rarely, he might shop for a "short period[] of time," buying bread, lunch meat, and "light items." (*Id.*). Again, she described his hobbies as watching television and going to church when not in too much pain, as well as chatting with visitors. (*Id.*).

She reported Plaintiff's impairments affected all the same abilities, explaining: "All of these items cause[] him to complain of pain and muscle spasms and pain in his legs and require[] relief by rest and medication." (*Id.* at Page ID # 239). She also did not know how long he could walk. (*Id.*). He could follow both spoken and written instructions. (*Id.*). Contrary to Plaintiff, she stated he had a short attention span and did not finish what he started. (*Id.*). Additionally, he handled stress "[n]ot well at times," and handled changes in routine "OK." (*Id.* at Page ID # 240).

Lastly, she corroborated that Plaintiff regularly used glasses and his therapy machine, as well as a cane "when pain in back and leg start to increase and when legs are weak." (*Id.* at Page ID # 240-241). Although she indicated Plaintiff's medications caused side effects, she did not know what they were. (*Id.* at Page ID # 241).

### iii.  Plaintiff's Testimony at the Hearing

Plaintiff testified at the administrative hearing. (R. 7 at Page ID # 70-93). Born on June 6, 1963, he was 53 years old at the time of the hearing. (*Id.*). He had a twelfth grade education as well as building services training from Chrysler and HVAC training. (*Id.*). He had not worked since July 2013. (*Id.*).

Since he last worked, he said, "[M]y body has changed." He could no longer lift as much, stand for as long, or walk as far as he had been able to. (*Id.*). Further, his concentration had suffered, and his vertigo made him unstable, sometimes causing him to fall or pass out. (*Id.*). He had chronic pain. (*Id.*). And working around chemicals or certain temperature changes triggered an asthma attack. (*Id.*).

As a result of Plaintiff's trouble bending and standing, his wife did "a large part" of the household chores such as cooking, cleaning, and grocery shopping. (*Id.* at Page ID # 71-72). Plaintiff helped out by washing a few dishes, heating up meals, ironing shirts, and dusting the television. (*Id.* at Page ID # 74). The more exertion an activity required, the faster his pain would set in. (*Id.*).

Plaintiff could stand for thirty minutes before he would experience sharp, stabbing pain "down through the buttocks and down [his] legs." (*Id.* at Page ID # 72). He could reach up, but if he bent down, he would not be able to get back up. (*Id.*). He could carry a gallon of milk in one hand, but could not move a television. (*Id.* at Page ID # 72-73). When grocery shopping, for example, he could carry small grocery bags, but not large or heavy ones. (*Id.*). If he was going to a small corner store, he would simply lean on the cart, but at

11

a bigger store like Wal-Mart where he would need to walk a lot, he would use an electric scooter. (*Id.*). And he would not go to a bigger store alone. (*Id.*).

Back in January, Dr. Sethi had prescribed Plaintiff a back brace for his lumbar pain and spinal stenosis. (*Id.* at Page ID # 75). Plaintiff wore it when he went out because it "alleviate[d] the pain to a degree" and helped him go longer without pain. (*Id.* at Page ID # 74-75). He was wearing the brace at the hearing and testified he had worn it "[o]n and off" that day for "probably eight hours." (*Id.* at Page ID # 75).

About two days a week, he was in "constant" pain, while the other days the pain would come and go. (*Id.* at Page ID # 76). He had not noticed anything in particular that triggered his worse days. (*Id.*). Two or three times a week, Plaintiff would wake up in such pain that he needed help getting out of bed and putting on his underwear, pants, and shoes, though he did not need help with his shower. (*Id.* at Page ID # 77).

Plaintiff's usual wake up time was at 4 A.M., as the pain kept him from sleeping. (*Id.*). He then watched television until his wife woke up around 6 A.M., took a shower, and had breakfast. (*Id.* at Page ID # 78). Then he would step out on the balcony unless he had "errands to run," such as a doctor's appointment to attend or a "small store run." (*Id.*). Usually his daughter picked him up; he did not drive often since his brace and his back limited his ability to "turn and look quickly," and he was afraid of causing an accident. (*Id.* at Page ID # 78-79). In the afternoon, he would check the mail and try to take a nap for an hour and a half, pain permitting. (*Id.*). Though Plaintiff's wife was at work all day, he was not alone the entire day because his daughter would stop in to check on him. (*Id.* at Page ID # 92-93). After his wife arrived home around 5 or 5:30 P.M., they would go to the store

12

together and "go get something to eat." (*Id.* at Page ID # 79). In the evening he would watch television, eat dinner, and chat with his wife before going to bed. (*Id.*). He estimated that every night he got about three hours of "actual sleep." (*Id.* at Page ID # 80).

Plaintiff's concentration also suffered, as he found himself dwelling on his pain and quality of life. (*Id.*). For example, if he were to watch a half-hour long television program, afterward he could remember "what it, in essence, was about, detail, maybe not." (*Id.*).

Plaintiff's lower back pain had worsened since the previous ALJ's decision—while it used to be mostly confined to the middle of his back, now it was "more weakness of the left leg but pain all through the buttocks and down the legs" to his feet, and it also moved up his back. (*Id.* at Page ID # 81-82). The pain struck every day, and was caused by squatting, bending over too far, standing too long, walking too far, or trying to lift something. (*Id.* at Page ID # 82-83).

By Plaintiff's estimate, he could sit for about forty minutes before the pain set in and he would need to stand or walk for a few minutes. (*Id.* at Page ID # 83). He could walk two blocks before needing to rest for ten to fifteen minutes. (*Id.*). The most comfortable position for him was lying on his right side, which helped take the stress of his spine and relax his muscles. (*Id.* at Page ID # 83-84). After about an hour of being upright, he had to lie down for about forty minutes "[i]f the pain is moderate." (*Id.* at Page ID # 84-85).

Vertigo also presented a problem: Plaintiff would suddenly feel nauseated, things would seem to spin, and then he would find himself on the ground. (*Id.* at Page ID # 85). And about twice a month, he felt dizzy and nauseated and had to sit down. (*Id.* at Page ID # 86). His most recent episode involving a fall had been the previous month. (*Id.* at Page

ID # 85). Before that, the last episode had been six to eight months prior. (*Id.* at Page ID # 85-86). He did not know what caused it, but he took medication "[i]f I have the bout, if I feel dizzy." (*Id.* at Page ID # 86). Attendant with the medication came the side effects of stomach problems, nausea, and diarrhea. (*Id.* at Page ID # 86-87). Plaintiff estimated he went to the bathroom five times a day. (*Id.* at Page ID # 87). He took other medications for the side effects, which helped "[t]o a degree," but did not totally resolve the issue. (*Id.*).

Additionally, Plaintiff had asthma, which was exacerbated by sudden changes from hot to cold, extremes of hot or cold, overexertion, and irritants like bleach, dust, smoke, car exhaust, or smoking grease. (*Id.* at Page ID # 87-88). He had two inhalers: one that he took every morning, and a rescue inhaler that he carried with him at all times. (*Id.* at Page ID # 88). During hot weather, he needed to use the latter every day; he had just used it the day before the hearing. (*Id.*).

Plaintiff also had glaucoma, which caused problems both reading and seeing at a distance, as well as pressure that made his eyes water. (*Id.*). He sometimes forgot to take his glaucoma medication even though he intended to. (*Id.* at Page ID # 92). In addition, he had been getting medical treatment at Wayne State University for his depression.[3] (*Id.* at Page ID # 89). He "was having some issues coping," crying a lot and "seeing myself in people because I don't want people to see me." (*Id.*). He also struggled with self-doubt and being afraid. (*Id.* at Page ID # 90). When at home, Plaintiff stayed in the bedroom, he said, explaining, "I just feel better there." (*Id.* at Page ID # 89-90). Some activities he used to

---

[3] According to the ALJ, "[W]e attempted to get the records [but] we were told that because it's a, these are students, there's no records." (R. 7 at Page ID # 89).

enjoy he had lost interest in—for example, going out to barbecues, walking, and going to gatherings with people—while others he could no longer do. (*Id.* at Page ID # 90).

Further, Plaintiff's hypertension caused dizziness, an enlarged heart, nausea, blurred vision, and weekly headaches. (*Id.*). To resolve the headaches, he took his blood pressure medication and tried to relax by sitting or lying down. (*Id.* at Page ID # 91). He estimated that he needed to lie down because of his heart once or twice a week. (*Id.*).

Lastly, Plaintiff had recently learned he had two polyps in his stomach and a "stomach infection." (*Id.* at Page ID # 92).

### iv.   The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Annette Holder also testified at the hearing. (R. 7 at Page ID # 93).  The ALJ's first hypothetical inquired about

> an individual who is currently 53 years old and possesses the same educational background and work experience as [Plaintiff]. Assume an ability to stand and walk no more than six hours in an eight hour day[;] the individual could sit up to six hours but would require a sit/stand option at least every 30 minutes[;] assume the individual could lift no more than 20 pounds occasionally and 10 pounds frequently, could only crouch, crawl, kneel, climb, balance, bend or stoop occasionally, [and] would need a clean air environment free from concentrated levels of dust, fumes, chemicals, gases, and other airborne irritants.

(*Id.* At Page ID # 94). The VE responded that the hypothetical person could perform unskilled light work, with positions available including bench assembler (130,000 nationally), inspector (84,000 nationally), and packer (75,000 nationally). (*Id.*). An added restriction that the person needed to avoid extremes of temperature would not affect the VE's answers. (*Id.* at Page ID # 94-95). Nor would additional restrictions preventing the person from performing "fine, close work such as a barber, machinist or needle worker,"

"operating vehicles and moving machinery," performing "prolonged visual vigilance such as monitoring a screen," and walking on uneven surfaces. (*Id.* at Page ID # 95-96).

If the person needed to take an unscheduled break of 30 to 45 minutes at least once a day, or even several 10- to 15-minute breaks throughout the day, however, that would preclude all competitive work. (*Id.*). The same would be true if the person regularly had to miss two or more days of work a month, as it would if the person were off-task at least 15 percent of the day for any reason. (*Id.* at Page ID # 96-97).

Finally, the VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles, except that her statements about the ability to sit or stand while performing work tasks were based on her professional experience. (*Id.* at Page ID # 96).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the

impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544.[4] The only opinions entitled to dispositive

---

[4] The rules in § 404.1527 apply for claims filed before March 27, 2017, as Plaintiff's was. For claims filed on or after that date, the rules in § 404.1520c apply instead. 20 C.F.R. § 404.1527.

effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as

the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he [or she] can still do despite his limitations," and is measured using

"all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the

claimant's statements with the other record evidence, considering his testimony about pain

or other symptoms with the rest of the relevant evidence in the record and factors outlined

in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis

and the conclusions drawn from it—formerly termed a credibility determination[5]—can be

disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977,

981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

### G. Analysis

Plaintiff's argument may be broken into four main points: (1) that the ALJ erred in

her assignment of weight to the state agency consultant; (2) that the ALJ failed to consider

even one of the requisite factors in evaluating Plaintiff's subjective complaints; (3) that the

Social Security regulations required the ALJ to consult a medical advisor to determine an

onset date; and (4) that the sit/stand option in Plaintiff's RFC eliminated enough light work

that he should have been found limited to sedentary work.

---

[5] On March 28, 2016, SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), superseded and replaced SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016). The Social Security Administration explained in SSR 16-3p that the ruling's main purpose was to eliminate the term "credibility," and thereby "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 WL 1119029, at *1 n.1.

Before I turn to Plaintiff's allegations of error, however, I will address the issue of *res judicata* and the effect of the Sixth Circuit decision's in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018).

About twenty years ago, the Sixth Circuit held that the "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

S.S.R. 98-4(6), 1998 WL 283902 (June 1, 1998).

Recently, however, the Sixth Circuit clarified the meaning of *Drummond*. In *Earley*, a Social Security Administration ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. *Earley*, 893 F.3d at 931. But "[t]hat is not how it works." *Id.* at 932. Rather, the Sixth Circuit explained, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Id.*

20

Courts applying *Earley* to litigation that arose before that case have asked whether the ALJ, despite following *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied the mandates of *Earley*; if not, then remand was appropriate. *See Dugan v. Comm'r of Soc. Sec.*, __ F. App'x __, 2018 WL 2769401 (6th Cir. 2018) (post-*Earley* Sixth Circuit decision finding ALJ pre-*Earley* appropriately considered administrative *res judicata* where she ultimately found new and material evidence of medical improvement meant she was not bound by a prior ALJ's determination); *Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. Sept. 17, 2018) (overruling objection and adopting R&R affirming Commissioner where ALJ had issued decision pre-*Earley* but still conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kimball v. Comm'r of Soc. Sec.*, No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. Aug. 7, 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *rep. & rec. adopted*, 2018 WL 4095081 (Aug. 28, 2016). *Cf. Seabolt v. Berryhill*, No. 3:17-CV-470, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "*Earley* had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision").

Here, the ALJ recognized in her opinion that *Drummond* was at the time the current case law in the circuit, and that therefore the prior finding on Plaintiff's RFC would be binding absent new and additional evidence or changed circumstances since the prior hearing. (R. 7 at Page ID # 54). But the ALJ went on to find that "new and additional

evidence . . . supports a change in the claimant's residual functional capacity, particularly the effect of his asthma." (*Id.* at Page ID # 54). Thus, she did not adopt the prior findings, but instead engaged in a "fresh review of a new application for a new period of time," *Earley*, 893 F.3d at 934. (*Id.* at Page ID # 49-60). I suggest that satisfies the mandates of *Earley*, and agree with Defendant, (R. 15 at Page ID # 610, n. 2) that *res judicata* did not bar the imposition of a different RFC than in the prior decision.

Neither party mentions that the ALJ *did* consider herself bound by the prior finding that Plaintiff was unable to return to her past relevant work, pursuant to *Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir. 1990). (Page ID # 59). I suggest that any error is harmless, however, because the ALJ found Plaintiff to have a *more* restrictive RFC than in the prior decision; it follows that Plaintiff could not be capable of his past relevant work now if he had not been with a *less* restrictive RFC.[6] I maintain, therefore, that *Earley* does not require remand in this case.

### 1. The State Agency Medical Consultant

Plaintiff's first allegation of error purports to be a violation of the treating-source rule, which requires an ALJ to give the opinion of a treating source controlling weight so long as it is "well-supported by medically accepted clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence in [the] case record." 20

---

[6] In the previous case, the ALJ found Plaintiff capable of a range of light work with a sit/stand option every 30 minutes and only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. *Rutledge v. Comm'r of Soc. Sec.*, 2:14-cv-14468, 2016 WL 1294843, at *2 (E.D. Mich. Apr. 4, 2016). In this case, the ALJ found the same but with the additional limitations that Plaintiff could lift no more than 20 pounds occasionally and 10 pounds frequently, and that he would need a "clean air environment" free from concentrated levels of dust, fumes, chemicals, gases, and other airborne irritants. (R. 7 at Page ID # 54).

C.F.R. § 404.1527(d)(2). But the ALJ here did not make *any* assignment of weight to a treating physician's medical opinion. Egregious though this may sound, I suggest the fault does not lie with the ALJ: It appears none of Plaintiff's treating sources offered a medical opinion.[7] The regulations define "medical opinions" as

> statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2).

It is less than clear whether Plaintiff intended to assert that the ALJ erred and some record evidence *was* a medical opinion. His argument centers on four specific pieces of evidence, which he describes as "Dr. Sethi's medical documentation":

- a February 2014 positive straight-leg raising test, (R. 7 at Page ID # 375);

- a November 2013 physical examination that found weakness with dorsiflexion of the left ankle at 4/5, (*id.* at Page ID # 353);

- November 2013 x-rays showing L4-5 intervertebral disc space narrowing and mild levorotoscoliosis, (*id.* at Page ID # 355); and

- A November 2013 MRI showing degenerative facet arthropathy at L5-S1 moderate to severe on the right and mild on the left, (*id.* at Page ID # 331-332).

---

[7] Though Plaintiff's brief discusses at length a medical opinion from Dr. Kohl, his citation indicates that opinion was submitted only as part of the record of Plaintiff's previous case. (R.11 at Page ID # 579-580). Indeed, it does not appear in the record before the Court. (R. 7). Nor does it seem the ALJ had it before her. (*Id.* at Page ID # 61-65). Since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Neither is this evidence "new," such that remand might be appropriate for its consideration under 42 U.S.C. § 405(g). Thus, I suggest the Court may not consider Dr. Kohl's medical opinion.

23

(R. 11 at Page ID # 585-586).[8]

Defendant interprets Plaintiff's brief as arguing that the documents listed above are "medical opinions" and deserved evaluation as such. (R. 15 at Page ID # 614-15). But as far as this reader can tell, Plaintiff is not actually arguing that any of the evidence from his treating physicians—consisting of medical imaging and appointment records—qualifies as a medical opinion (nor did this reader see any evidence from Plaintiff's treating physicians that obviously met the definition). Plaintiff does not cite or allude to 20 C.F.R. § 404.1527(a)(2), or even use the term "medical opinion," and he does not even obliquely suggest the above evidence reflected Dr. Sethi's "*judgments* about the nature and severity of [his] impairment(s)." § 404.1527(a)(2) (emphasis added). This interpretation is further supported by the fact that Plaintiff has selected quite small, specific portions of his appointment records—not any of Dr. Sethi's more narrative notes for the February 2014 appointment, for example, but *only* the fact that Plaintiff had a positive straight-leg raising test on his right side. (R. 11 at Page ID # 585-586) (citing R. 7 at Page ID # 375).

Instead of doing any of the above, Plaintiff focuses on the weight given to state agency consultant Dr. Khalid, and his argument that the ALJ "did not adequately address Dr. Sethi's documentation" in her explanation of why she gave significant weight to Dr. Khalid, (R. 11 at Page ID # 585). *See* (*id.* at Page ID # 586) ("[T]he ALJ incorrectly stated that there is no objective evidence supporting greater limitations and errors [sic] in giving

---

[8] Because Plaintiff later accuses the ALJ of failing "to even address much of the treating medical evidence at all," (*i.e.*, the evidence listed above), (R. 11 at Page ID 586-587), I pause to observe that the ALJ acknowledged all the above pieces of evidence. (R. 7 at Page ID # 56).

greater weight to [Dr. Khalid] . . . ."). Thus, I understand Plaintiff's argument to be that the ALJ erred by not addressing those "physical examination findings and objective medical evidence" *only* insofar as they undermine the opinion of state agency consultant Dr. Khalid.

Even if Plaintiff *were* asserting the above evidence amounted to medical opinions, I suggest that argument would fail. The evidence consists of two medical imaging reports and two very specific physical examination results, not "judgments" of Dr. Sethi. In fact, as Defendant notes, (R. 15 at Page ID # 615), the November 2013 physical examination appears to have been conducted by not Dr. Sethi, or a treating physician at all, but a physician's assistant. (R. 7 at Page ID # 353). A physician's assistant is not an acceptable medical source, and cannot issue a "medical opinion." SSR 06-3p, 2006 WL 2329939, at *2 (2006) ("Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' . . . ."); *See LaRiccia v. Comm'r of Soc. Sec.*, ___ F. App'x ___, No. 12-4198, 2013 WL 6570777, at *7 (6th Cir. Dec. 13, 2013).

But I turn now to whether the ALJ properly explained her assignment of significant weight to Dr. Khalid. Plaintiff wishes to draw the Court's attention to potentially favorable pieces of evidence. If the Commissioner's decision is supported by substantial evidence, however, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Here, the ALJ explained she gave significant weight to Dr. Khalid because his opinion was consistent with record evidence, including that Plaintiff's physical examination findings were "minimal at best" with no evidence of acute distress, gait

abnormalities, range of motion deficits, or reduced muscle strength, excepting that one occasion in November 2013 when he demonstrated weakness with dorsiflexion of the left ankle at 4/5. (R. 7 at Page ID # 57-58). Further, she explained, found no evidence of "significant deterioration or worsening of his lumbar spine since the prior decision," pointing to the same November 2013 diagnostic imaging as Plaintiff, and noting it found "no significant degenerative disc diseases changes." (*Id.*) (citing *id.* at Page ID # 332). And she observed that he did not have any follow-up appointments regarding his back pain between February 2014 and the date last insured in December 2014—in fact, he did not return to Dr. Sethi at all until July 2015, more than a year after his last appointment. (*Id.*) (referring to *id.* at Page ID # 490-491). He did not report back pain or weakness at ER visits in May 2014 and March 2015. (*Id.* at Page ID # 57-58) (citing *id.* at Page ID # 388, 500).

In addition, his asthma appeared to be "sufficiently managed with treatment." (*Id.* at Page ID # 58). In January 2014, he reported not having needed to use his rescue inhaler. (*Id.* at Page ID # 58) (citing *id.* at Page ID # 452). Notable, too, was the absence from the record of any ER treatment for asthma exacerbations, physical exam findings of lung or respiratory abnormalities, or mentions that Plaintiff's asthma was uncontrolled from the alleged onset date through the date last insured. The ALJ acknowledged that several months after the date last insured, in March 2015, Dr. Kohl his symptoms were worse, but that appeared to be because he had run out of Qvar; they discussed "getting him back on his controller." (*Id.* at Page ID # 58) (citing *id.* at 448). He was taking Albuterol and reported "good relief." (*Id.*).

In conclusion, I suggest that substantial evidence supports the ALJ's decision to assign significant weight to Dr. Khalid, and that she sufficiently explained her reasoning.

Lastly, I address Plaintiff's argument that the ALJ erred by assigning significant weight to Dr. Khalid because "[a]gency regulations mandate that more weight should be granted to the opinions of a treating source than to the opinions of State Agency physicians." (R. 11 at Page ID # 584). The first stumbling block, as explained above, is that Plaintiff did not offer any treating source opinions in his case. The second is that he mischaracterizes the law. The very section he cites states explicitly, "*Generally*, we give more weight to medical opinions from . . . treating sources . . . ." 20 C.F.R. § 404.1527(d)(2) (emphasis added). And the Social Security Administration has recognized that "[i]n appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." S.S.R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). *See also Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015) ("Generally, an ALJ is permitted to rely on [a] state agency physician's opinions to the same extent as she may rely on opinions from other sources."); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("Certainly, the ALJ's decision to accord greater weight to state agency to accord greater weight to state agency physicians over [the claimant's] treating sources was not, by itself, reversible error."). Thus, I suggest this argument is also unavailing.

## 2. The ALJ's Analysis of Plaintiff's Subjective Complaints

Plaintiff next avers the ALJ erred by failing to consider even one of the factors in 20 C.F.R. § 404.1529(c)(3) in evaluating his subjective complaints. (R. 11 at Page ID #

589-590). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, *see Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987), and generally cannot be disturbed absent a "compelling reason," *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

As explained earlier, where the ALJ is faced with an absence of objective, confirming evidence of a claimant's symptoms, she ought to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). But the ALJ "is not required to discuss every factor or conduct a factor-by-factor analysis." *Pratt v. Comm'r of Soc. Sec.*, No. 1:12-cv-01084, 2014 WL 1577525, at *3 (W.D. Mich. Apr. 21, 2014) (collecting Sixth Circuit authority), *adopted by* 2014 WL 1577525 (Apr. 21, 2014). And besides, a quick perusal of the record is sufficient to confirm that the ALJ discussed many, if not all, of the above factors, including Plaintiff's daily activities, (*id.* at Page ID # 55), reports of pain, (*id.*), and medication and treatment, (*id.* at Page ID # 55-58). And Plaintiff does not suggest a compelling reason to disturb her analysis of his credibility, but merely repeats his subjective complaints and arguments regarding the state agency consultant and

evidence from Dr. Sethi dispatched above. I therefore see no reason to disturb the ALJ's credibility analysis.

### 3. SSR 83-20 Did Not Require the ALJ to Consult a Medical Advisor to Determine His Onset Date

Plaintiff suggests that under SSR 83-20, the ALJ "should have called on a medical expert to determine if the significant findings in the updated MRI of August 12, 2015 could have been present prior to his date last insured of December 31, 2014." (R. 11 at Page ID # 591). *See* (R. 7 at Page ID # 520 (August 12, 2015 MRI)). Specifically, the MRI report conclusion found: (1) Interval progression of the attenuated appearance of the thecal sac in the distal spinal canal, particularly at L5-S1 due to epidural lipomatosia; and (2) interval progression of the facet arthropathy at L5-S1 resulting in moderate bilateral foraminal stenosis. (*Id.*).

SSR 83-20 recognizes that where precise evidence of the onset date is unavailable, "it may be possible, based on the medical evidence[,] to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination." SSR 83-20, 1983 WL 31249, at *3 (1983). In such a case, the ALJ "should call on the services of a medical advisor when onset must be inferred." (*Id.*).

As Defendant observes, however, SSR 83-20 "applies only when there has been a finding of disability and it is necessary to determine when the disability began." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). There has been no finding of disability in this case, and SSR 83-20 has no work to do here.

Further, as a general rule, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). Such evidence is usually irrelevant unless it establishes the impairment also existed during the insured period. *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 920-21 (E.D. Mich. 2014). Neither the MRI nor any medical opinion in the record indicates that the MRI results say anything about Plaintiff's condition when his insured status ended almost 8 months earlier. Thus, I suggest this argument should fail.

### 4. Whether Plaintiff Should Be Limited to Sedentary, Not Light Work

Lastly, Plaintiff avers that some of the restrictions in his RFC would preclude the finding that he was capable of a limited range of light work, and instead relegate him to sedentary work—thus potentially allowing Plaintiff to "grid out" due to his age.[9] 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.04. (R. 11 at Page ID # 591-594). As Defendant notes, this is the same argument that Plaintiff made, unsuccessfully, in his prior case before this same Court. *Rutledge v. Comm'r of Soc. Sec.*, No. 14-144468, 2015 WL 12697650, at *7 (E.D. Mich. Sept. 25, 2015), *rep. & rec. adopted by* 2016 WL 1294843 (E.D. Mich. Apr. 4, 2016).

---

[9] Plaintiff was 51 years old on the date last insured, and thus fell in the category of "closely approaching advanced age." (R. 7 at Page ID # 49); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 202.00(d). Plaintiff suggests that if he were limited to sedentary work, 201.12 would direct a finding of disability. *Id.* at 201.12; (R. 11 at Page ID # 591-594). But that rule is for claimants with an unskilled work history, and Plaintiff had previous work in both semi-skilled and unskilled positions, (R. 7 at Page ID # 59). Thus, even if Plaintiff were limited to sedentary work, he would *not* automatically "grid out"—he might fall under either 201.14, 201.15, or 201.16, depending on whether his education provided for direct entry into skilled work and whether his skills were transferable. 20 C.F.R. Pt. 404, Subpt. P, App. 2. *If* he were limited to sedentary work, then, the regulations would direct a finding of disability only if the ALJ found both that his education did not provide for direct entry into skilled work, *and* that his skills from his past work were not transferable. *Id.* at 201.14.

Here, as there, Plaintiff makes much of the Social Security Administration's Program Operations Manual System (POMS). POMS offers some guidance for cases like Plaintiff's, where his "exertional capacity falls in the middle of two rules and the rules direct opposite conclusions," (R. 11 at Page ID # 593); it directs the Commissioner to apply the

> higher-numbered rule and find the claimant not disabled if you conclude the claimant has a slightly reduced capacity for the higher level of exertion; or
>
> lower-numbered rule and find the claimant disabled if you conclude the claimant has a significantly reduced capacity for the higher level of exertion.

POMS DI 25025.015(D). Though the Sixth Circuit considers it "persuasive," POMS "does not have the force and effect of law." *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (1989).

Regardless, I see no indication the ALJ rebelled against POMS DI 25025.015(D). The ALJ noted that Plaintiff's ability to perform all or substantially all the requirements of light work was impeded by additional limitations. (R. 7 at Page ID # 59). Therefore, "[t]o determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured," the ALJ consulted the VE. (*Id.* at Page ID # 59-60). Because the VE testified that with those limitations, Plaintiff would be able to work as a bench assembler, inspector, or packer—all light work and totaling more than 130,000 positions nationwide—the ALJ determined that the occupational base was not significantly eroded, and found Plaintiff capable of a reduced range of light work. (*Id.* at Page ID # 60).

A Sixth Circuit panel had occasion to address an argument similar to Plaintiff's in

31

*Branon*, 539 F. App'x at 679-81. In that case, too, the ALJ found the plaintiff's RFC was for a limited range of light work with additional limitations, including that the plaintiff needed to change position every 30 minutes. (*Id*. at Page ID # 680). Had the ALJ found Plaintiff's RFC limited him to only sedentary work, the applicable grid would have directed a finding of disability. (*Id*.). The Court rejected the plaintiff's argument that his inability to do only some light work "erode[d]" or "decimate[d]" the number of jobs available, as the VE had testified that a significant number of jobs existed that met Plaintiff's limitations. (*Id.* at Page ID # 680-81).

Plaintiff's argument here should be rejected for the same reason, as it was the previous time he attempted it. *Rutledge*, 2015 WL 12697650, at *7.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (R. 16), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 17), be **GRANTED**, and this case be **AFFIRMED**.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 31, 2019                         S/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 31, 2019                         By s/Kristen Castaneda
                                               Case Manager